Mr. Justice McKINLEY
delivered-the opini'on.of the court.
This case conies before this court on a writ of error to the Supreme Court of the state of Alabama..
! The plaintiffs brought an action of ejectment against the defendants, in the Circuit Court for the county of Mobile, in said state; and upon the trial, they read'in evidence the following claim and'entry: 44 To the register and receiver of the Land-office at St. Stephen’s: You will please'to take’notice, that I,. James jEtheridge, of Mobile county, Alabama, claim the right of pre-emption, under the -act of Congress, of the 29th qf May, ,1830, to- the’ south-west quarter-section 22, township 4,'-range 1 West ;” 'and that, on the 28th day of January, 1831, the said James Etheridge made the necessary proof that he . had planted and cultivated said quarter-section in the year 1829, and remained in possession until' after the 29th day of May, 1830. The plaintiff also read in evidence a patent from the United States, bearing date the 30th day of May, 1833, reciting that, “Whereas James Etheridge, of Mobile county, Alabama, has deposited in the General Land-office of the United States, a certificate of the register of the Land-office at St. Stephen’s, whereby-’it appears that payment has been;made by the. said James Etheridge, according to the provisions of the act of Congress of the 24th of April, 1820, entitled 4 An act making further provision for the sale of the public lands,’ for the south-west quarter-of section -22, in township 4, south of range 1 west, in the district of lands subject to sale at St. Stephen’s, Alabama,- containing ninety-two acres -and sixty-seven hundredths of an acre, according to the official plat of the survey of the said lands, returned to the General Land-office, by the surveyor-general, which said tract has been purchased by the said James Etheridge:
44 Now know ye, that the United States-of America, in consideration of the premises, and in conformity with the several acts, of Confress, in such case made and provided, have given and granted, and y.these presents do give and grant, unto the said .James Ethéridge, pad to his heirs, the said tract,' above described,” &c,
*661 . In obedience to an order of the Circuit Court, the -surveyor-üf Mobile county went upon the land in controversy, and made an actual survey, and returned a plat thereof into court, showing that the section 22 was covered by private land claims, except the whole, of the-south-west quarter,, on which James Etheridge had made his entry; and a small fraction in the south-east quarter, entered, under the pre-emption law, by William D. Stone; and a fraction in* the north-east and nórfe-wést quarters of said section; which plat was given in evidence to the jury. And the plaintiffs proved, by the surveyor, that he found the south-west comer of said fractional sec-, tion as shown by the plat returned; and also found, on the section-lines of said fractional section, the half-mile posts, each post being half a mile from .the south-wegt comer, of said fractional section; that these posts bore evidence .of being-,those put down by fee surveyor of fee. United States, on running'-fee section lines; that an entire south-west quarter-section exists ill said fractional section, without interfering wife any private land claim, leaving a residuum on fee north and fee east of said quarter-section.
The/defenclants gave in evidence to the jury fee following claim -■•and-enjty, made by fee said William D. Stone.: “To fee register' -and receiver of fee Land-office at St. Stephen’s, Alabama: You will please to take notice, that I; William D. Stone, of. Mobile county, Alabama, claim the right of pre-emption,'under the act of Congress, of the 29th-of May, 1830, to the fraction situated in the west part of the south-east quarter of section 22, in toymship 4, range 1 west of 13.” And on fee 25th of March, 1831, he made the necessary affidavit and proof to show feat he had planted and cultivated the above described tract of land, according to said act of fee 29th of May, 1830. And they also gave in evidence, fee following patent: “ The United' States of America to all to whom these presents shqll come, greeting: Whereas William D. Stone, of Mobile, has deposited in fee General Land-office of the United States, a certificate of the .register of the Land-office at St. .Stephen’s, whereby it appears feat full payment has been made'by the said William Df Stone, according to fee act of Congress, of fee 24th Of April, 1820, entitled ‘.An act making further provision for the sale of fee public lands,’ for fee south-east subdivision of fractional section 22, in township 4 south, of range 1 west, in fee district of lands subject to sale at St. Stephen’s, Alabama, containing one hundred and ten acres and fifty-one hundredths of an acre, according to fee official plat of fee surveyor of. said land, returned to the General Land-office by fee surveyor-general; which said tract has been purchased by fee said William D. Stone: Now know ye, that fee United States of .America, in consideration of the premises-, and in conformity wife fee .several acts of Congress in such case made and provided, have given and granted, and by these presents do give and grant, unto fee said William D. Stone, and his heirs, the said tract above described,” *662 &c. And it was admitted by the plaintiffs, that the defendants had all the rights of said Stone in the land admitted to have been in their possession, at the time ,of the sendee of the declaration;_ and the defendants admitted that the plaintiffs had, at the date of the demise, and time of trial, all the rights of said patentee, Etheridge, in the land described in the declaration.
And the parties “ not wishing to encumber the record, by copying from the book entitled ‘ General Acts of Congress respecting the sale and disposition of the public lands, with instructions'issued, from time to time, by the secretary of the Treasury, and commissioner of the General Lánd-office,, and official opinions of the attorney-general, on questions arising under the land laws;’ and which instructions in the 2d vol., part the 2d, prepared and printed by the Senate, agree that said book may be used by either party, and any thing therein contained read as illustration of the practice' of the Land-office, and construction that the acts of Congress had received in that'branch of the government. The same work can be referred to', by either party, in the Supreme Court, for the purpose aforesaid. The parties further agree that the exhibit,' No. 2, being the official plat of the survey 'of the township described in the patents of both plaintiffs and defendants, between pages 134 and 135, shall be referred to as if the same was incorporated with, and formed a part of the record-in this cause.” This statement furnishes all the evidence deemed necessary and pertinent to the investigation of the questions involved in the principal' instruction of the Circuit Court, to the jury, on the trial of the cause; which instruction is as follows: “ The court further instructed the jury, that, if said fractional section, No. 22, was capable of being subdivided into an entire southwest. quarter-section, and -t\yo half-quarter-sections, leaving a residuum, as shown by said map and evidence of the county surveyor, still the surveyor-general was not required, under the acts of Congress, providing for the subdivisions of the public lands, and the instructions of the secretary of the Treasury, made under the act of the-24th of April, 1820, entitled .- An act, making further provision for the sale of the public lands,’ to make in his subdivision of. the same, either such quarter-section, or half-quarter-sections; but might • lawfully subdivide the same into two lots, A and B, as indicated by said plat of 1832; and that under said evidence, Etheridge’s title would not hold the whole south-west quarter of. said fractional section, but only lot A; and that Stone’s.title would.hold lot B, being, the balance of said fractional section.” To this instruction the plaintiffs excepted.
Upon the construction here given to the act of Congress,, and to the instructions of the secretary of the Treasury thereon, referred to in the above instruction of the court, depends the whole controversy between the parties to this suit.. The 1st section of the act of'Con? gress, above-referred to, is in these words: “That from and after *663 the first day of July next, all the public lands of the United States, the sale of which is, or. may be, authorized by law, shall, when offered at public sale to the highest bidder, be offered in half-quár- ' ter-séctions; and when offered at private sale, may be purchased, at the option of the purchaser, either in entire sections, half-sections, quarter-sections, or half-quarter-sections; and in every case of .the division of a quarter-section, 'the line for the division thereof shall run north and south, and the comers and contents of half-quarter sections, which may hereafter be sold, shall be ascertained in the manner and on the principles directed and prescribed by the second section of an act, entitled £ An act concerning the mode of surveying the public lands of the United ■ States,’ passed the- 11th day of February, 1805, and fractional sections, containing one hundred and sixty acres, or upwards; shall, in like manner, as nearly as practicable, be subdivided into half-quarter-sections, under such rules and regulations as may be prescribed by the secretary of the Treasury.” 3 Story’s Laws, 1774.
The settled .policy of Congress has been to survey the public lands in square figures, running the lines north and south, and east and west, and to extend the subdivisions authorized by law, as far as practicable, in square figures, to the lowest denomination.
The second section of the act of the 18th of May, 1796, chap: 29, directs, that the public lands “ shall be divided by north and south lines, run according to the true meridian, and by others crossing them at right angles, so as-to form townships six miles square, unless where the line of the late Indian purchase, or of tracts of land heretofore' surveyed or patented, or the course of navigable rivers may render it impracticable, and then this rule shalTnot be departed from further than such particular circumstances may. require.” After directing how townships should be divided into sections, it directs that “fractional townships shall be divided into sections in manner aforesaid, and the-fractions of sections shall be. annexed to, and sold with, the adjacent entire sections.” 1 Story’s Laws, 422. The lowest denomination authorized by this act, was sections; but the direction -to the surveyor was to divide the fractional townships ■ into as many sections as the particular circumstances-would permit. And so by the 1st section' of the act of the 24th of April, 1820, the surveyor is directed to subdivide fractional sections, containing one hundred-and sixty acres and upwards, into as many half-quarter-sections as practicable, by running the lines north and south. And .this statute conferred no' power on the secretary of the Treasury to make any regulation, by which a fractional section might be divided into any quarter, or other subdivision than half-quarter-sections. The only authority he acquired by the statute, was to make such rules and regulations as would enable the surveyor to make the greatest number of half-quarter-sections out of a-fractional section, by running the lines north and south, or east and west; and. this *664 power he executed, by his circular letter, to the surveyors-general, of the 10th of June, 1820, 2d part, Public Land Laws, &c., 820.
Had the surveyor-general subdivided the fractional section 22, now in controversy, according to law, there would have been two half-quarter-sections in the south-west quarter, making that quarter complete, a fractional section .in the south-east quarter, and a fractional section in the north-east and north-west quarters, making four tracts or subdivisions instead of two, as returned by him to the Land-office of the district: None of the lines, subdividing sections, are required by law to be made by actual survey1, and marked on the land; but they are to be delineated on the township plats, according to the 2d section of the act of the 11th of May, 1805, chap. 74, referred to in the act of the 24th of April, . 1820, (2 Story’s Laws, 961.) When the township and section lines. are run,, and the comers marked according to law, the quarter-section lines are ascertained on the plat .by protracting lines across the section north and south, and east and west, equidistant from the section lines; and so of other subdivisions. And a surveyor going on the land to ascertain the boundary .of a quarter, or half-quarter-section, would do it with, as much ease and certainty as -if it had been delineated on the plat by the surveyor-general. Extending ■the subdividing lines on the township plats, is not* therefore, essentially necessary to enable the register to sell the land, or to give title to the purchaser. The register is as much bound to know what is a legal subdivision of á section, or fractional section, as is the sur-', veyor-general.
Because he is directed by law to offer the lands, when sold' at public sale, in half-quarter-sections. To enable him to perform this duty, he must know what a half-quarter-section is.- And before he can offer a fractional section for sale, he must see that it has been subdivided, so as to enable him to. offer ^as much of it in half-quarter-sections as practicable. When Etheridge applied to purchase the south-west quarter of this fractional section at private sede, as he had a right to do, under the act granting pre-emption rights, the register was bound to know whether such a subdivision could be obtained according to law. A bare inspéction of the township plat must have satisfied-him, in this case, that it was practicable to obtain an entire quarter-section in the south-west comer of the'fractional section 22; The 1st section of the act of the 24th of April, 1820, directed that this fractional section should be divided into as many half-quarter-sections as practicable, by lines north and south; and the instructions given by the secretary of the Treasury under this act, directed that it should be divided into half-quarter-sections, by north and south, or east and west lines, so as to preserve the most compact and convenient forms. .
T1 ;re is nothing in any of the acts of Congress, nor in the instruc■tions of the secretary of the Treasury, to authorize the division of *665 this fractional section made by the surveyor-general, and it being a violation of the law, and contrary to the duties of his office, it must be regarded as a void act. Miller and others v. Kerr and others, 7 Wheat 1. So far as Stone’s claim was concerned, this division of the. fractional section has. been treated’ by the register and the commissioner of the General . Land-office as a legal subdivision, and the register seems to have'disregarded entirely the act granting preemption rights, and Stone’s claim and proofs under it, and to have transferred his claim to the western lot of the fractional section as divided by the surveyor-general. The certificate, of the register, recited in the patent of Etheridge, takes no notice of this subdivision of the fractional section, but states-that Etheridge had “ purchased of the register the lot or south-west quarter of section, number 22,” &c. The patent is for the whole of the south-west.quarter of section 22, by its proper designation, and if no quantity of land had been expressed in it, all the land contained iii the quarter-section would have passed, by the patent, to Etheridge ; because, by-the 2d section of- the act of the ilth of February, 1805, before referred to, it-is provided thati“ half-sections and quarter-sections, the contents of which have not been returned, .shall be held and considered as" containing the one-half, or the. one-fourth respectively, of the contents of the section of which they make part.” The surveyorfailed to return the contents of the quarter-section in this case; it was liable, therefore, to be sold’ by the above rule. But-it has been insisted that Etheridge, and those claiming under him, were bound, and concluded by the number of acres expressed in the patent. It is evident the .quarter-section was not referred to for’the number of acres contained in it; but by express words reference was made to the plat returned by the surveyor-general, showing the division of the.fractional section into'two parts, one of which contains the number of acres expressed in Etheridge’s patent," and the other the number of acres expressed in Stone’s patent. It has been already shown that this plat was illegal, and the subdivision of the fractional section void; and any reference, therefore, to this plat, to show the number of acres granted to Etheridge, is illegal and inconsistentwith every previous step taken towards perfecting his title, and utterly repugnant to the previous words of grant used in the patent.
Thus it appears, that neither the claim of. Etheridge, filed with the register, ffie certificate of purchase issued by him, nor the patent issued to Etheridge by the commissioner of the General Land-office, is founded on the division of the fractional section made by thé surveyor-general ; but the whole appears to be founded on the subdivision of the fractional section into one quarter-section, and two fractional sections, made by actual survey on the land. It is true that, in undertaking to state the quantity of land contained in the quarter-section, reference is made to what is there called the official plat of the lands returned to the General Land-office by the sur *666 veyor-general; which is nothing more than a reference to this same subdivisión of the fractional section so often mentioned. But this question necessarily arises: How can the contents of either division of the fractional section, thus divided into two lots or subdivisions, show the contents or number of acres in. the south-west quarter of the same section ? The ninety-two acres and sixty-seven hundredths of an acre mentioned in the patent,- is the number of acres contained in the western subdivision of said fractional section, and consists of part of the south-west, and part, of the north-west quarters of the.fractional section, as appears by the plat used on the trial. No part of the north-west quarter of this -fractional section can by any reasonable construction be considered as being within and part of the land included in;.a patent for the south-west quarter of the section. This proves that the reference to this plat, in Ethe-ridge’s patent, is both delusive and illegal, and- must, therefore, be rejected as void and inoperativé.
The act of the 29th of May, 1830, to grant pre-emption rights to settlers on the public lands, chap. 209, appropriated this quarter-section of land, on which Etheridge1 was then settled, to his claim, under the act, for one year, subject, however,-to be defeated byhis failure to comply with its provisions. During that time, this quarter-section was. not liable to any other claim, or to be sold-to any other person, except at public sale, under the proclamation of the President of the United States; and that Etheridge had a right to prevent, by paying for it as directed by the act. - And as he has complied with all the requisitions of the act, as far as the mistakes and illegal acts' of the miriisterial officers of the government would permit, he has acquired a good title by his patent, against the United States, for the whole of said south-west quarter-section. The remaining question is, whether Etheridge’s title is good against Stone’s patent? Stone claimed “the right of pre-emption, under the act of Congress of the 29th of May, 1830, to the fraction situated in the west part of the south-east quarter of section. 22, in township 4, range 1 west.” This claim confined his pre-emption right to-that specific fraction.' And although the act gave to every settler on the public lands the right of pre-emption of one hundred and sixty acres, yet if a settler, happened to be seated on a fractional section, containing less than that' quantity, there is no provision in the act by which he could make up the deficiency, out of the.adjacent lands, or any other lands. The only case provided for in the act, by which the pre-emptioner had the right to enter land outside of the quarter, or fractional section, on which he was settled at the passage of the act, is the case provided for in the 2d section. When two- or more persons were settled on the same quarter-section, it mi¿ht be divided between the two first settlers, and each be entitled to a ¡pre-emption of eighty acres of land elsewhere, in the same land-district. But, in this case, Stone was not only permitted to take *667 land, outside of the fractional section, on which he was settled, but he wras permitted to take land on which Etheridge was settled, and to which he had previously proved his right under the same act of Congress.
In the case of Lindsay and others v. Miller and others, 6 Peters, 674, the plaintiffs in ejectment claimed title under a patent, dated the 1st of December, 1824, founded on an entry and survey made in the" same year. The defendants claiméd title under an entry,, made in January, 1788, upon a military warrant, for services rendered in the Virginia state-line, and a survey made thereon, in the same month, and recorded on the 7th of April, of the same year, and a patent, issued by the state of Virginia, in March, 1789. This land lay in what is called the military district, between the rivers Scioto and Little Miama, in the state of Ohio. This district had been re-sérved, in the deed of cession, dated the 1st of March, 1784, made by Virginia to the United States, to satisfy the claims of the Virginia troops on continental establishment, in the event of there not being ■ sufficient good land for that purpose, in a reservation previously. made by Virginia, on the south-east side of the. Ohio river. A1--though die defendants proved possession, under this title, for upwards of thirty years, the entry, survey, and patent, were adjudged by the ' court to be void, on the ground that the land had been reserved for • the satisfaction of military warrants, granted for services of the Virginia troops on continental establishment,. and was -not, therefore, subject to entry upon warrants for services rendered in the Virginia state-line.
In the case'before the court, all the land in the south-west quarter of the fractional section had been appropriated, by law, to satisfy Etheridge’s claim, and no other land could be substituted in lieu of that quarter-section, for any part of it, Stone’s claim- arose under the same law, and by the same provisions was confined to the fraction in the west part of the south-east quarter of the same section, and gave no right to land elsewhere.' So much of the patent to Stone as purports to grant land within the south-west quarter .of the section, is, therefore, not only an appropriation of land to his claim, not subject to .if according to the act, but which,by the same act, had been appropriated to another Naim, arising under the same act, concurrent with and equal in all respects to Stone’s claim. How, then, could his patent give him title to land, that was not subject to his claim; land that he never had legally claimed; and to land.that, by law, had been appropriated to and claimed-by another? It seems to us, this case is clearly within the principles settled in the case above referred to, and that the patent granted to Stone is void, for so much of the land included in it as lies, within the said south-west .quarter of the fractional section, and for which Etheridge holds a patent.
It has been insisted, however, that as Etheridge only paid for the quantity of land mentioned in his patent, that he can have no right *668 to land paid for by Stone, and included in his patent. This is one of the results of the-mistaken and illegal acts.of the ministerial officers of the government, which, as already shown, can . neither-benefit one party, nor prejudice the rights of tbe other. The United States have received full payment for all the land contained in both patents.. And if-Stone has paid for land which belonged to Etheridge, that is a matter to be.adjusted between themselves, amicably}-or bylaw, as they may choose.
Upon a full view of the whole case, it is the opinion of the court, that.the judgment of the Supreme Court of Alabama be reversed.