OSCAR A. WILSON v. JOHN M. HOFFMAN.

[See 54 Mich. 246.]

*Public lands—Surveys—Fractional section—Meander lines—Patent—*
*Description of tract—Boundary line—Location by*
*agreement.*

1. Fractional sections are caused, in extending the surveys of the public domain, by lakes, or other bodies of water, and streams that are meandered, and Indian or other reservations.

2. Section 1 of the act of Congress of date April 24, 1820 (3 U. S. Stat. at Large, 566), applies where a stream of sufficient magnitude to be meandered, under the instructions to the surveyor, runs through a section, thus cutting it into two parcels, both of which are thereby made fractional. If one portion exceeds 160 acres, the Surveyor General divides it up, according to his discretion, under the statute, and instructions issued by the Secretary of the Treasury. He may carve out 160 acres, and divide the balance into lots, "regard being had to convenient forms, and so to avoid the subdivisions of the public domain into ill shaped and unsalable fractions." If one portion contains less than 160, the law requires it to be sold as one parcel.

3. In granting patents for lands, it is usual for the government to add, immediately after the statement of the number of acres which the tract contains, if it be fractional, these words: "According to the official plat of the survey of said lands returned to the General Land-office by the Surveyor General," which language constitutes a part of the description of the premises conveyed, and limits the purchaser to the tract as marked upon said plat.

4. The description in a government patent of that portion of a section lying south of a meandered stream, and containing less than 160 acres, as the S. E. fractional ¼ of the section, "according to the official plat of the survey of said lands returned to the General Land-office by the Surveyor General," is sufficient in connection with the official plat, and is quite a customary method of description in the General Land-office.

5. The facts embraced in the fifteenth, sixteenth, seventeenth, and eighteenth findings of fact (see opinion) are insufficient to establish a boundary line by agreement.

Error to St. Clair. (Stevens, J.) Argued May 17, 1888. Decided June 8, 1888.

Ejectment. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Frank Whipple,* for appellant.

*Avery Brothers,* for defendant, contended that the case is ruled by the former opinion.

CHAMPLIN, J. Plaintiff brought ejectment to recover possession of land described as follows:

"A portion of the south-east fractional quarter of section twenty-eight (28), in town (7) north, range seventeen (17) east, and bounded as follows: Commencing at a point where the south line of said section intersects the bank of Black river; thence east, on the south line of the said section, seventy-nine and one-half (79½) rods; thence, forty-three degrees and twenty-seven minutes (43° 27 min.) west, to the bank of Black river; thence south-westerly, along the bank of Black river, up stream, to the place of beginning, —containing about seven acres of land."

To establish his right to recover, the plaintiff introduced a patent from the United States to Hartford Tingley, conveying the south-east fractional ¼ of fractional section 28, township 7 N., range 17 E., containing 117.47 acres, dated July 3, 1826. The case was tried before the court without a jury, who made a written finding of facts and law as follows:

"The plaintiff brings ejectment to recover a portion of the west fifty acres of the S. E. fractional ¼ of section twenty-eight (28), T. 7 N. of R. 17 E., more fully described in the declaration. He seeks to establish his title through the following conveyances, viz.:

"1. A patent from the United States to Hartford Tingley.

"2. A power of attorney from Hartford Tingley, recorded in liber F, page 95.

"3. A warranty deed from Hartford Tingley, by his attorney, to Ralph Wadhams, recorded in Liber F, page 230.

"4. A warranty deed from Ralph Wadhams to Charles Butler, recorded in Liber H, page 176.

"5. A declaration of trust by Charles Butler, recorded in Liber K, page 308.

"6. A quitclaim deed from Charles Butler, trustee, to Oscar A. Wilson, the plaintiff, recorded in Liber 74, page 404.

"7. There is another chain of title from Charles Butler, trustee, to the plaintiff, through sundry conveyances, some of which are defective in description and otherwise. In the year 1880 a bill was filed in the circuit court for the county of St. Clair, in chancery, by Lydia A. Geel, then the holder of this defective title, to correct the error in the descriptions in the deeds, and a decree was made and entered ordering the same corrected, and Mrs. Geel conveyed this title to plaintiff. A plat of the township was offered in evidence, together with a copy of the field-notes, both duly certified, from which it appears that this section (28) was a fractional, and that Black river was a meandered stream in this township (7 N., 17 E.), and through said section.

"8. The defendant seeks to hold possession of the premises through the following conveyances, viz.:

"9. A deed from Jacob Denlar to the defendant, conveying the south-east part of the S. W. ¼, south of Black river, of section 28, T. 7 N., of R. 17 E.

"10. A deed from Ira Davenport to defendant, conveying the E. ½ of S. W. quarter of section twenty-eight (28), T. 7 N., of R. 17 E.

" 11. A tax deed from the Auditor General of the State to Ira Davenport conveying the same premises to him.

" 12. A tax deed to Daniel B. Harrington, conveying the south-east part of the S. W. fractional ¼ of section 28, T. 7 N., of R. 17 E. 30 acres.

" 13. The patent to Hartford Tingley conveys the S. E. fractional ¼ of section 28, T. 7 N., of R. 17 E., containing 117.47 acres, and the subsequent conveyances through which plaintiff claims are of the same description, or a portion thereof.

" 14. The premises occupied by the defendant, and whose metes and bounds are given' in the declaration, lie wholly west of where a line would be if run north and south through the said section, and equidistant from the east and west sides thereof.

" 15. Some nine years before the commencement of this suit, while the heirs of James M. Geel were in possession of the land in controversy, the defendant, John M. Hoffman, set up a claim that the south-east part of the S. W. ¼ of section 28, T. 7 N., of R. 17 E., extended across and upon the southerly side of Black river, and that by the deed from Jacob Denlar he had acquired title to that piece of land, which, if said premises had extended across said river, would be bounded as follows, viz.: Commencing at the quarter post on the north side of section 33; thence running north to Black river; thence south-westerly, along said river, to the point where the section line bounding said section 33 on the north would intersect said river; thence easterly, on said section line, to the place where the quarter post should be located.

" 16. At that time it was proposed between said Hoffman and said Burton C. Geel and Cummings S. Geel that, in order to arrive at an amicable settlement in regard to the claimed title of said Hoffman, the piece of land which he claimed to have acquired should be divided between said Hoffman and the Geel heirs by a division line running from the so-called quarter post above mentioned, on the north side of section 33, north-west to Black river; and, in pursuance of this proposition, a brush fence was constructed—one-half by Burton C. Geel, one of the heirs of James M. Geel, and the other half by defendant—along the proposed line; and it was understood that, when the Geel heirs were of age, they should convey to defendant the land in controversy, and defendant should convey to them the land claimed by defendant on the north-easterly side of said proposed division line;

and said fence has been allowed to remain from the time it was built up to the time of commencing this suit.

"17. A short time after the proposition to divide said land by the exchange of deeds between them, Burton C. Geel and Cummings S. Geel, who represented and acted for and on behalf of themselves and other heirs, ascertained that the defendant had no title to the land claimed by him, nor to the part now in controversy; and they, within a year after the erection of the fence, notified said defendant that the Geel heirs refused to carry out the proposed agreement to convey the land described in plaintiff's declaration, for the reason they had become satisfied, upon examination, that the title which defendant claimed was of no value.

"18. And, although said fence has been permitted to remain upon said proposed division line, it has not, since the time Hoffman was informed by said Geels that they did not admit that he had any title to the land in question, and that they refused to carry out the proposition to deed the same, been acquiesced in as a division line fence, nor has it been kept up or maintained for that purpose.

"19. Plaintiff gave no notice to quit other than that above mentioned, but forbid defendant cutting timber on the premises before the commencement of suit. The defendant, at the time of the commencement of this suit, was in possession of said premises, and is still in possession and holds such premises.

"As a conclusion of law, I find that, as the land lies west of where a line from the quarter post on the south drawn to the quarter post on the north of said section, it is not within the south-east fractional quarter of said section, and therefore the defendant is not in possession of any lands described in the plaintiff's declaration which the plaintiff is entitled to recover, and is entitled to judgment for his costs to be taxed, and execution therefor.

"*Dated August* 1, 1887.          HERMAN W. STEVENS,
                              " Circuit Judge."

This case was before us at the June term, 1884, and is reported in 54 Mich. 246 (20 N. W. Rep. 37).

At that time, there was no map or field-notes of the United States survey properly in evidence, and consequently nothing to show in what manner the land had been platted and sold by the United States. In that opinion, we referred to the

act of Congress of February 11, 1805, prescribing how the surveys of the public domain belonging to the United States should be surveyed. That act, in terms, does not refer to fractional sections. A later act of April 24, 1820 (3 U. S. Stat. at Large, p. 566), entitled—

"An act making further provision for the sale of the public lands,"—

By the first section enacts—

" That from and after the first day of July next, all the public lands of the United States, the sale of which is, or may be authorized by law, shall, when offered at public sale, to the highest bidder, be offered in half quarter sections; and when offered at private sale, may be purchased, at the option of the purchaser, either in entire sections, half sections, quarter sections, or half quarter sections; and in every case of the division of a quarter section, the line for the division thereof shall run north and south, and the corners and contents of half quarter sections, which may thereafter be sold, shall be ascertained in the manner, and on the principles directed and prescribed by the second section of an act entitled, 'An act concerning the mode of surveying the public lands of the United States,' passed on the 11th day of February, 1805; and fractional sections, containing one hundred and sixty acres, or upwards, shall, in like manner, as nearly as practicable, be subdivided into half quarter sections, under such rules and regulations as may be prescribed by the Secretary of the Treasury; but fractional sections, containing less than one hundred and sixty acres, shall not be divided, but shall be sold entire."

Fractional sections are caused, in extending the surveys of the public domain, by lakes, or other bodies of water, and streams that are meandered, and Indian or other reservations. This section of the statute applies where a stream of sufficient magnitude to be meandered, under the instructions issued to the surveyor, runs through a section, thus cutting it into two parcels, both of which are thereby made fractional. If one portion exceeds 160 acres, the Surveyor General divides it up, according to his discretion, under the statute, and instructions issued by the Secretary of the Treas-

ury.  He may carve out 160 acres, and  divide the balance
into lots, —

"Regard  being  had  to convenient forms, and  so to avoid
the subdivisions of  the public domain into  ill-shaped  and
unsalable fractions."

If one portion contains less  than 160 acres, the law requires
it to be sold as one  parcel.

The field-notes of the government survey of the  township
in question show that the survey was made in 1823, and con-
sequently the survey and sales of the land in  question were
governed by  the acts of 1805 and 1820, and the regulations
adopted by the Secretary of  the Treasury thereunder.

The map of the government survey, introduced in evidence
in this case, is an apt illustration of the method pursued

under the law in reference to fractional sections, caused by a stream cutting a section into two parcels. The Black river runs through section 28, and is a meandered stream. The line A—B is not on the original map, but has been placed there for the purpose of indicating the east line of the premises in dispute. By referring to the foregoing map of the government survey of section 28, township 7 N., range 17 E., it will be observed that the portion of the section lying north of the Black river exceeds 160 acres. It was therefore subdivided, in the Surveyor General's office, by carving out an entire quarter section, being the N. W. ¼, and dividing the balance by lines running north and south so as to be most salable. That portion south of Black river was estimated to contain 117.48 acres, which, being less than 160 acres, the law required should not be divided, but should be sold entire.

In granting patents for lands, it is usual for the government to add, immediately after the statement of the number of acres which the tract contains, if it be fractional, these words:

"According to the official plat of the survey of said lands returned to the General Land-office by the Surveyor General."

Such language, when used, constitutes a part of the description of the premises conveyed, and limits the purchaser to the tract as marked upon the plat of the Surveyor General. This was so held in *Gazzam v. Lessee of Phillips*, 20 How. 372, which overruled the same case in 3 How. 650, under the title of *Brown's Lessee v. Clements*. This was the language used in the patent to Tingley.

In the case, when formerly here, the map of the original survey, as before observed, was not so certified as entitled it to be received in evidence; and there was nothing in the case, as then presented, that showed that the premises described

in the declaration came within the description of the S. E. $\frac{1}{4}$ of section 28. In the record before us, this has been obviated, and the copy of the original plat of the township has been introduced which shows, according to the government survey, that the premises in question are embraced in what the government denominated the S. E. fractional $\frac{1}{4}$ of section 28 in its patent to Tingley. It might, perhaps, have been more accurate to describe it as that portion of section 28 lying south of Black river; but, as the fraction contained less than 160 acres, and the law required it to be sold entire, the description contained in the patent, in connection with the official plat, was sufficient, and is quite a customary method of description in the General Land-office.

The conclusion of law which the court below arrived at, so far as it holds that, under the facts of this case, as now disclosed, the premises claimed are not contained in the claim embraced in the declaration, is erroneous.

We do not think that the facts embraced in the fifteenth, sixteenth, seventeenth, and eighteenth findings of fact are sufficient to establish a boundary line by agreement, or estop the plaintiff from asserting title.

The tax deed to Ira Davenport, in 1846, cannot avail the defendant. The description evidently applies to the portion of the S. W. $\frac{1}{4}$ north of Black river.

The judgment must be reversed, and a new trial ordered.

The other Justices concurred.